FLOYD & CO., Inc., Plaintiff, v. CINCINNATI GAS & ELECTRIC COMPANY, Defendant.

Common Pleas Court, Hamilton County.

No. A-128100. Decided July 31, 1953.

432

Cors, Scherer, Hair & Hartsock, Gorman, Silversteen & Davis, Ragland, Dixon & Murphy, Cincinnati, for plaintiff.
Peck, Shaffer & Williams, Cincinnati, for defendant.

## OPINION

By WOESTE, J.:
This case is before the Court upon demurrer to the petition.

This petition admittedly presents an unusual if not a unique claim for damages. It alleges that the plaintiff, Floyd and Company, dealer, seller and installer of gas space heating equipment suffered a loss of profits, which it further alleges it would have enjoyed by the sale of such equipment over a period of time, if the defendant had not violated certain emergency orders of the Public Utilities Commission of Ohio, appertaining to the distribution and consumption of the available gas supply to the consumers of that commodity in the State of Ohio.

Because of its genetic legal characteristics as a cause of action, the petition is quoted verbatum.

"Now comes the plaintiff, Floyd & Co., Inc., and says that it is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 1616 Madison Road, Cincinnati, Ohio; and that it is engaged primarily in the business of selling, installing and servicing gas and electric appliances and space heating equipment, at wholesale and retail.

"Plaintiff says that the defendant, The Cincinnati Gas & Electric Company is a corporation organized under the laws of the State of Ohio, with its principal place of business located at Fourth and Main Streets, Cincinnati, Ohio, and that it is engaged in the business of supplying electricity for light, heat or power purposes to consumers, and also in supplying natural and other gas for power and heating, including space heating in Cincinnati and vicinity, and is engaged in the business of a public utility as defined in §§614-2 and 614-2A GC, and as such, subject to the statutes of Ohio regulating public utilities and the rules, regulations and orders of the Public Utilities Commission of Ohio.

"Plaintiff further says that on or about the 3rd day of October, 1947, The Public Utilities Commission of Ohio, under Docket No. 13618, issued an Emergency Gas Order directed to and mandatory upon all public utility companies in the State of Ohio furnishing natural gas to consumers thereof, a copy of which is attached hereto, incorporated herein by reference, and marked Exhibit 'A'; that on or about the 1st day of April, 1948, the said The Public Utilities Commission of Ohio issued a Second Emergency Gas Order, supplementing the original order, which is attached hereto, incorporated herein by reference, and marked Exhibit 'B'; that on or about the 5th day of October, 1948, said The Public Utilities Commission of Ohio issued a Third Emergency Gas Order, supplementing the previous orders, which is attached hereto, incorporated herein by reference, and marked Exhibit 'C'; that on or about the 25th day of January, 1949, said The Public

Utilities Commission of Ohio issued a Fourth Emergency Gas Order, supplementing the previous orders, which is attached hereto, incorporated herein by reference and marked Exhibit 'D'; that on or about the 6th day of April, 1949, said The Public Utilities Commission of Ohio issued a Fifth Emergency Gas Order, supplementing the previous orders, which is attached hereto, incorporated herein by reference, and marked Exhibit 'E'; that on or about the 6th day of September, 1949, said The Public Utilities Commission of Ohio issued a Sixth Emergency Gas Order, supplementing the previous orders, which is attached hereto, incorporated herein by reference and marked Exhibit 'F'; and that on or about the 12th day of September, 1950, said The Public Utilities Commission of Ohio issued a Seventh Emergency Gas Order, supplementing the previous orders, which is attached hereto, incorporated herein by reference, and marked Exhibit 'G.'

"Plaintiff further says that, under the rules and provisions of the said Orders of The Public Utilities Commission of Ohio, defendant was required to refuse to furnish gas for additional space heating equipment, new space heating equipment, or conversion equipment until and unless the prospective consumer should, prior to the connection of said equipment to the gas service lines of defendant, apply for and obtain a permit in writing from defendant authorizing such use; and that said Orders further require defendant, if the consumer fails to obtain said approval or permit, to notify said consumer to disconnect such equipment within ten (10) days and, upon his failure to do so, to discontinue the entire supply of natural gas to such consumer until the equipment is disconnected.

"Plaintiff further says that immediately upon the issuance of said Emergency Order, as hereinabove set forth, and from time to time thereafter, the defendant notified this plaintiff that a supply of gas would be refused to any prospective consumer for space heating unless and until a written permit was first obtained by the consumer prior to the installation of space heating equipment; and if any installations were made without a permit being first obtained that the defendant company would shut off the supply of gas to said consumer.

"Plaintiff says that acting in accordance with the orders of The Public Utilities Commission and the representations of the defendant company, the plaintiff complied at all times with the rules, regulations and orders of The Public Utilities Commission and the aforesaid rules, regulations, and directions of the defendant company made in pursuance thereof, and that it refused to install space heating equipment for consumer customers unless and until said consumers had first

obtained written permits from defendant for such installations (and so advertised in newspapers circulating in Greater Cincinnati).

"Plaintiff says that the defendant, The Cincinnati Gas & Electric Company has failed, refused and neglected to comply with and enforce the mandatory order of The Public Utilities Commission of Ohio as hereinabove set forth, in the following respects, to-wit:

"1. Defendant permitted the installation of approximately Nine Thousand (9,000) space heating equipment installations during the year 1948 in the Cincinnati area without written permits first obtained as required by said orders and the rules and regulations of defendant in pursuance of said orders, despite the fact that defendant had knowledge of said unlawful and unauthorized installations.

"2. Defendant permitted the installation of approximately Fifteen Thousand (15,000) space heating equipment installations during the year 1949 in the Cincinnati area without written permits first obtained as required by said orders and the rules and regulations of defendant in pursuance of said Orders, despite the fact that defendant had knowledge of said unlawful and unauthorized installations.

"3. Defendant permitted the installation of approximately Eight Thousand (8,000) space heating equipment installations during the year 1950 in the Cincinnati area without written permits first obtained as required by said orders and the rules and regulations of defendant in pursuance of said Orders, despite the fact that defendant had knowledge of said unlawful and unauthorized installations.

"4. Defendant, in violation of said orders, has failed, refused and neglected to direct the consumers who have made such unlawful and unauthorized installations to disconnect such space heating equipment and discontinue such service, or in any other manner to enforce said orders of The Public Utilities Commission of Ohio.

"5. Defendant in violating the aforesaid orders of The Public Utilities Commission has discriminated against this plaintiff in permitting installations to be made without approval, and has fraudulently caused this plaintiff, by failing to enforce the orders, to lose business and customers by reason of its acts and omissions.

"Plaintiff further says that, if the defendant had acted as required by the said Orders of The Public Utilities Commission of Ohio as hereinabove set forth and discontinued the supply of natural gas to those consumers who made unlawful and unauthorized installations of space heating equipment

as aforesaid, the natural gas supplied to said installations would then have been available for lawful and authorized installations of space heating equipment.

"Plaintiff says that during the year 1948 the plaintiff installed two hundred fourteen (214) space heating equipment installations in the City of Cincinnati, and that the profit plaintiff made on each such installation was $84.89. Plaintiff says that if the defendant company had complied with and enforced the aforesaid Orders of The Public Utilities Commission of Ohio that the plaintiff would have installed or been able to install six hundred ninety-three (693) additional space heating equipment units at a like profit, but that by reason of defendant's violations of said orders aforesaid, plaintiff was unable so to do, all to plaintiff's damage in the sum of Fifty-Eight Thousand Eight Hundred Twenty-Eight and 77/100 ($58,828.77) Dollars.

"Plaintiff says that during the year 1949 the plaintiff installed six hundred ninety (690) space heating equipment installations in the City of Cincinnati, and that the profit plaintiff made on each such installation was $84.89. Plaintiff says that if the defendant company had complied with and enforced the aforesaid Orders of The Public Utilities Commission of Ohio that the plaintiff would have installed or been able to install one thousand three hundred ninety-five (1395) additional space heating equipment units at a like profit, but that by reason of defendant's violations of said orders aforesaid, plaintiff was unable so to do, all to plaintiff's damage in the sum of One Hundred Eighteen Thousand Four Hundred Twenty-One and 55/100 ($118,421.55) Dollars.

"Plaintiff says that during the year 1950, the plaintiff installed three hundred eighty-seven (387) space heating equipment installations in the City of Cincinnati, and that the profit plaintiff made on each such installation was $84.89. Plaintiff says that if the defendant company had complied with and enforced the aforesaid orders of The Public Utilities Commission of Ohio that the plaintiff would have been able to install three hundred twenty-eight (328) additional space heating units at a like profit, but that by reason of defendant's violations of said orders aforesaid, plaintiff was unable so to do, all to plaintiff's damage in the sum of Twenty Seven Thousand Eight Hundred Forty-Three and 92/100 ($27,843.92) Dollars.

"Plaintiff says that this action is instituted under the provisions of §614-68 GC, and that the actual damages set forth in paragraphs 9, 10, and 11 are Two Hundred Five

Thousand Seven Hundred Seventy-Three and 36/100 ($205,-773.36) Dollars, but that by reason of the provisions of §614-68 GC, plaintiff is entitled to treble the amount of damages sustained in consequence of the violation, failure and omission by the defendant to comply with the orders of the Public Utilities Commission herein set forth.

"WHEREFORE plaintiff prays damages against the defendant in the sum of Six Hundred Fifteen Thousand Two Hundred Eighty-Two and 72/100 ($615,282.72) Dollars and for its costs herein expended."

To facilitate the test as to whether or not these emergency orders of the P. U. C. O., alleged to have been violated, are actionable, Exhibit A attached to the petition and made part thereof, and which is typical of all the orders involved, with one exception, is quoted also.

### SUPPLEMENTAL EMERGENCY ORDER

"On September 29, 1947, this matter came on for further hearing pursuant to the Commission's Order of September 15, 1947, at which hearing further testimony was received. and at which representations were made by members of the public of Ohio municipalities and of representatives of affected business interests.

"WHEREUPON, the Commission on the basis of the evidence presented at said hearing of September 15, 1947, and the further evidence presented on September 29, 1947, finds that:

"The general public, the municipal representatives, business representatives and all interested parties were represented and afforded an opportunity to be fully heard;

"Due notice of the hearing of this matter was given by telegram to all natural gas companies in Ohio known by the classifications 'A,' 'B' and 'C,' and all such companies were present and afforded an opportunity to be heard fully;

"The unprecedented demand for gas and the inability of the utilities and their suppliers to provide facilities to make additional gas available to consumers in the State of Ohio has created an emergency affecting the health, safety and welfare of the people of the State of Ohio which will continue to prevail at least during the coming winter 1947-1948;

"Such emergency arises in part from the inability of Ohio utilities having sources of supply outside the state of Ohio to secure full performance of contracts to deliver gas during the coming winter season 1947-1948 from such sources;

"During the winter season 1946-1947 not only where large industrial gas consumers curtailed much of the time in accordance with this Commission's Administrative Order No.

46, but at frequent intervals extensive curtailment of many other smaller commercial consumers became necessary and on peak days curtailment of domestic gas use had to be solicited and enforced by the distributing utilities in Ohio;

"During the winter 1946-1947, a comparatively mild winter, with substantially all industrial consumption curtailed, with resultant loss of employment, the domestic shortage reached the total of well over 100 million cubic feet per peak day with an average mean temperature never lower than 10 degrees. At one time over 47,000 domestic gas users in Ohio were entirely without gas service;

"The major distributing utilities in Ohio have from time to time adopted Rules and Regulations with the approval of this Commission calculated to meet this emergency by imposing restrictions and curtailments upon the use of gas for space heating purposes. These Rules and Regulations were not uniform, and the lack of uniformity has led in many instances to uncertainties and confusion;

"The major natural gas companies have during the period 1946-1947, expended large sums of money in an effort to improve their capacity to produce, receive, transmit and deliver natural gas to their consumers in Ohio. These programs could be classified generally as follows;

"(1) An accelerated new drilling program has practically taxed the maximum capacity of Ohio fields to produce. New areas for the storage of natural gas under ground were developed and expanded. Sixty-seven (67) wells were drilled in existing storage areas to facilitate the speedy withdrawal of gas so stored.

"(2) New large diameter gas transmission lines have been installed and are in the process of completion, adding over 350 miles to the capacity of these companies, at a cost of over $25,000,000.00. Additional compressor facilities have been installed to the extent of the utmost capacity of all transmission facilities that could possibly be provided.

"(3) One company has expended a quarter of a million dollars in improving its water gas plant for use on peak days. Four large propane-air plants having a productive capacity of 81 million cubic feet per day for three to four peak days have been constructed in the state for use only in cases of extreme emergency at an operating cost vastly exceeding that of any other type of gas fuel.

"(4) New and additional contracts have been negotiated and secured calling for the delivery of natural gas from all possible sources outside the State of Ohio. Experience has indicated that commitments of this type are not a guarantee of a constant source of gas."

The Commission further finds that:

"Notwithstanding the restrictions heretofore put into effect by the major utilities with the approval of the Commission, and the efforts of such utilities as hereinbefore set forth, and that further restrictions on the sale of natural gas for space heating are necessary, and that it is essential that such restrictions be applicable universally to all gas distributing utilities dependent in whole or in part upon supplies of gas from others, and that such restrictions shall be of uniform operation throughout the state of Ohio.

"The best estimates of the major companies, which estimates have been carefully scrutinized by the Commission, show that curtailment during the winter 1947-1948 will be as severe as previously experienced;

"Certain gas producing and distributing companies have sufficient supplies of gas to serve all their present and prospective demands;

"The Commission further finds that the emergency hereinbefore referred to continues to exist and that in conjunction therewith the emergency order of September 15, 1947, should be modified and amended for the purposes of adjusting certain matters in the public interest found to exist within the State of Ohio in the development and construction of new homes and in the outfitting of residences for continued occupancy.

"It is therefore

"ORDERED, That effective at 12:01 A. M., October 4, 1947, the following emergency Rules and Regulations be and they hereby are adopted and prescribed for and made applicable to all utilities or companies furnishing natural gas service in the State of Ohio, with the exception hereinafter made. All availability clauses, terms and conditions in or appertaining to any and all schedules, rules or regulations, now on file with the Commission or that may hereafter during the continuance of this emergency be filed with the Commission, applicable to the furnishing of natural gas to consumers in Ohio, are, because of and for the period of such emergency, altered so as to contain therein the following limitations and restrictions with respect to the supplying of service thereunder;

"RULE 1: No distributing utility shall supply or be required to supply natural gas service to any consumer present or prospective in the State of Ohio for equipment designed to furnish the source of space heating that replaces other fuels, or for additional space heating equipment.

"RULE 2: No distributing utility shall supply or be required to supply natural gas service to any consumer present or

prospective in the State of Ohio, for new or additional equipment designed to provide gas space heating in any building, unless proof is furnished to the utility:

"(a) That gas fired heating equipment was registered with the utility and approval for the installation of such equipment was given by the utility prior to September 16, 1947, except that in territory where the utility had no rules and regulations with respect to gas curtailments prior to September 16, 1947, such equipment shall be registered and approval for the installation thereof obtained on or before October 10, 1947.

"(b) In the case of new construction of a building or buildings not designed for residence or dwelling purposes that a binding contract for such gas space heating equipment had been entered into prior to the effective date of this order. Copies of such contracts must be furnished to and registered with the utility on or before ten days after the effective date hereof.

"(c) In the case of new construction of a building or buildings designed for residence or dwelling purposes, whether built by owner, contractor for owner, real estate sub-division developer or any other person or persons having a binding contract or commitments, that obligations or commitments for such construction or building material or for gas space heating equipment had been entered into prior to the effective date of this order. Copies of such contracts or commitments must be furnished to and registered with the utility on or before ten (10) days after the effective date hereof, together with such other facts as the utility may deem proper. If such building program or project covered by such contracts, commitments or obligations for which gas space heating service is desired is not substantially started by January 1, 1948, gas service for space heating shall not thereafter be furnished in such instances.

"RULE 3: Nothing herein contained shall prevent natural gas consumers in the State of Ohio, either through their utility or their appliance dealer, from replacing gas fired space heating equipment, provided that the capacity of the equipment to be installed does not exceed the capacity of the replaced equipment.

"RULE 4: Whenever evidence available to the utility reasonably indicates that any consumer has connected gas fired space heating equipment which is not under these rules eligible for service from the utility's gas service lines, the utility shall forthwith in writing direct such consumer to disconnect such equipment and discontinue the use of such service, and if

such consumer shall fail or refuse to do so within ten (10) days, the utility shall discontinue the entire supply of natural gas to such consumer and shall withhold such supply until such gas fired space heating equipment has been disconnected. To insure against reconnection of such space heating equipment the utility, before re-establishing service to such consumer, shall take such measures as may be deemed practicable and necessary to restrict the flow of gas to quantities required for other than space heating purposes.

"RULE 5: Each distributing utility in the State of Ohio shall curtail natural gas service to industrial consumers when and to the extent necessary to supply the demands during peak periods of its domestic consumers in accord with this Commission's administrative Order No. 46, but shall restore such curtailed service when the emergency is past.

"RULE 6: No action taken by any utility in compliance with these rules shall be deemed to constitute unjust discrimination or a violation of any of the provisions of The Public Utilities Commission Act, the General Orders of this Commission, or the schedules, rules, and regulations of such utility.

"RULE 7: Failure of any gas distributing utility to abide by and support the provisions of this order shall subject such utility and its responsible officers, agents and employees to the penalties provided by The Public Utilities Commission Act.

"This order shall not be applicable to any gas producing and distributing companies which have sufficient supplies of natural gas from their own wells, wells under their control or from local producing and distributing companies to serve all their present and prospective demands.

"It is further

"ORDERED, That this supplemental emergency order shall become effective forthwith, and that a further public hearing in this matter shall be held on March 2, 1948.

"It is further

"ORDERED, That a true copy of this emergency order be filed forthwith in the office of the Secretary of State of the State of Ohio."

The substantial sum claimed as damages ($615,282.72), and the serious implications of the import of a favorable termination of the action, have stimulated counsel to the most resourceful and ingenious arguments on behalf of their respective clients, of which the case is capable. These arguments are most thoroughgoing and have been of profound interest to the Court.

To reveal the scope of counsel's detailed presentations it is

well that their respective claims should be spread upon this opinion.

Counsel for the defendant contend:

"I. The 'law does not spread its protection so far' as Floyd & Co. for alleged failure of a natural gas utility to enforce emergency orders of the commission as to natural gas consumers of said utility—Floyd & Co., a seller and installer of gas space heating equipment to consumers of said utility cannot assert damages or injury when the injury, if any, was done to prospective customers of said natural gas utility.

"II. The lifting of restrictions by the Sixth order removed actionable 'violations' if any existed.

"III. The elements of a cause of action for fraud are not stated.

"IV. Floyd & Co. has not alleged, as it must, a determination by the commission as to the existence of violations. The determination of the existence and number, if any, of such violations is a problem for the expert administrative knowledge of the commission. The commission is presently investigating this question.

"V. Floyd & Co.'s injuries, if any, are speculative as it has not alleged that defendant prevented it by its wrongful action, from carrying out existing contracts with its customers.

"VI. Floyd and Company has failed to allege a cause of action for damages under §614-68 GC because it has not alleged 'willfulness.'

"VII. The action was not brought within the time limited for the commencement thereof, i. e. one year, because it is for a penalty or forfeiture."

Counsel for the plaintiff contend:

"I. Floyd & Company was directly injured by the Defendant's deliberate violations of the emergency orders of the Public Utilities Commission, and therefore, as such injured party, has the right to assert damages against the Defendant.

"II. The Sixth Supplemental Order did not have the effect of legalizing the prior acts of the Defendant, which, when committed, were violations of the preceding orders.

"III. Fraudulent conduct on the part of the Defendant is clearly alleged and characterizes the action of the Defendant in failing to carry out the orders of The Public Utilities Commission.

"IV. The various remedies provided by statute for the enforcement of the orders and regulations of the Commission are cumulative, and an action by an injured party for damages caused by a violation of those orders need not be predicated upon a determination of the fact of violation by the Commission.

"V. Plaintiff's damages are alleged to be a certain result of the Defendant's illegal conduct; their extent may be measured with reasonable certainty by the jury; and it is not necessary to allege for that purpose that the Defendant prevented the Plaintiff from carrying out existing contracts with its customers.

"VI. The allegations of the petition clearly show that the violations of the orders of the Commission were committed in the face of actual knowledge of those orders and not as the result of misunderstanding, honest mistake or other excusable conduct on the part of the Defendant and the omission of the word 'wilfullness' in respect to those violations is not fatal.

"VII. The suit at bar is by an injured private party to recover damages, not penalties; the latter may be recoverable by the state, which has not been damaged by the violations."

It is not deemed to be the function of a trial Court to adjudicate all of the propositions of law projected, if there be one which is determinative of the demurrer and upon which the trial Court entertains a conviction as a matter of law, and which would be dispositive of the demurrer. Such is the case in this instance. The Court addresses itself therefore to the query:

Does the petition state a cause of action?

At this juncture, it is held that the petition does not plead a cause of action sounding in fraud. The elements of actionable fraud are not stated.

The conduct of the defendant which is alleged to be the predicate of liability is contained in the first paragraph on page 3 of the petition and is requoted here for particularization.

"Plaintiff further says that, under the rules and provisions of the said Orders of The Public Utilities Commission of Ohio, defendant was required to refuse to furnish gas for additional space heating equipment, new space heating equipment, or conversion equipment until and unless the prospective consumer should, prior to the connection of such equipment to the gas service lines of defendant, apply for and obtain a permit in writing from defendant authorizing such use; and that said Orders further require defendant, if the consumer fails to obtain said approval or permit, to notify said consumer to disconnect such equipment within ten (10) days and, upon his failure to do so, to discontinue the entire supply of natural gas to such consumer until the equipment is disconnected."

The action seeks treble damages under §614-68 GC which provides:

"Treble damages on violations.—If any public utility or railroad does, or causes to be done, any act, matter, or thing prohibited by this act, or declared to be unlawful, or shall omit to do any act, matter or thing required by this act, or by order of the commission, such public utility or railroad shall be liable to the person, firm or corporation injured thereby in treble the amount of damages sustained in consequence of such violation, failure or omission; provided, that any recovery under this section shall in no manner affect a recovery by the state for any penalty provided for in this act."

Upon examination of the laws of the State of Ohio administered by the Public Utilities Commission, the only conclusion at which the Court is able to arrive is that these laws have application to the utilities as defined therein, and to the persons to be benefited thereby—the consumers of gas. This group cannot and should not be enlarged so as to include others who are not specifically mentioned therein nor those who are not clearly in contemplation of the legislature at the time of the enactment.

The plaintiff, in order to sustain his position, must bring himself within the scheme of the statute as an entirety.

The pleader in this instance has urged in effect that the defendant, in addition to having violated the emergency order pleaded, committed other overt acts which gave rise to an action at common law. With this we cannot agree.

The Court heretofore in this opinion has disposed of the question of fraud, as being insufficiently pleaded. The contents of paragraph two, page three of the petition is urged as being the basis for damages. It reads:

"Plaintiff further says that immediately upon the issuance of said Emergency Order, as hereinabove set forth, and from time to time thereafter, the defendant notified this plaintiff that a supply of gas would be refused to any prospective consumer for space heating unless and until a written permit was first obtained by the consumer prior to the installation of space heating equipment; and if any installations were made without a permit being first obtained that the defendant company would shut off the supply of gas to said consumer."

This paragraph in the opinion of the Court merely reveals a voluntary reiteration of the Commission's orders, which are presumed to have been already within the knowledge of the plaintiff and such reiteration, therefore, cannot be said to be the basis of such misrepresentation as to warrant an action at common law. No contractual relationship between the parties hereto is alleged in the petition.

It can be reasonably stated that this action would not have

been in being except for the provisions of §614-68 GC. It must rise or fall as an action conceived exclusively under the authority of that section of the code.

Again then, does that section inure to the benefit of the plaintiff, a seller and installer of gas space heating equipment, who is in no contractual relationship with the defendant and who is not included in the group to be protected or benefited by the legislation involved?

The Supreme Court of Ohio has not specifically passed on this question, and we are sensitive that this opinion pioneers the current question involved as a precedent in Ohio. That being true, resort to similar and analogous cases in point elsewhere is required.

The case of Jennie DePauw Memorial Methodist Episcopal Church v. New Albany Water Works, 193 Indiana 368 is considered to be apropos of the case at bar. In that case plaintiff sued in tort for damages for total destruction of its church building because of the defendant's negligent failure to maintain fire hydrants for use. The alleged duty was the statutory one imposed on Water Companies in Indiana to supply water. At common law, the plaintiff would have had no such right of action and it so admitted. However, it predicated liability, first, on the statutory duty to supply water under certain conditions and the court held that this particular statute did not alter the common law; and, second, on a statute almost identical to §614-68 GC, herein at issue. Said Sec. 116 of the Indiana Statutes reads:

"If any public utility shall do, or cause to be done or permit to be done, any matter, act or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing required to be done by this act, such public utility shall be liable to the person, firm or corporation injured thereby in the amount of damages sustained in consequences of such violation; provided that any recovery as in this section provided shall in no manner affect the recovery by the state of the penalty prescribed for such violation."

The court, at page 374, stated:

"Section 116, supra, merely gives a right of action. The right of action so given does not point solely to Sec. 7, supra, but to many other sections of the act which specify duties to be performed as well as things which are prohibited. Again, it should be borne in mind that the legislature is using words in giving these rights of action, which have been seriously and definitely defined by this court, which definitions are universal in all the courts of recognized authority. The legislature saw fit to give a right of action to any person **injured** instead of

to any person **damaged.** No one has a right to damages occasioned by an injury unless there is some person who,is legally answerable for having caused such injury, for 'negligence will not be a ground of legal liability unless the party whose conduct is in question is already in a situation that brings him under the duty of taking care.' Pollock, Law of Torts (10th ed.) ch. XI. In other words, in order to create a right to damages, two things must concur: That the one claiming the damages has suffered an injury; and that someone is legally answerable for having caused it. **'Injury,' as used by the legislature in this section, is held to mean a legal or actionable wrong**; and because, by express statute under Sec. 7 of the Public Utilities Act, supra, no duty is cast upon the water company to furnish water for extinguishing fires in behalf of any individual that did not exist at common law, but only to the municipality, no actionable wrong was committed against appellant. City of North Vernon v. Voegler (1885), 103 Ind. 314, 319; Krom v. Antigo Gas Co. (1913), 154 Wis. 528 140 N. W. 41, 143 N. W. 163, and authorities there cited."

Thus, the court held that said Sec. 116 conferred no right which did not exist at common law.

Several years later, the same Supreme Court of Indiana arrived at the same conclusion on similar facts. In Larimore v. Indianapolis Water Co. (1926), 197 Ind. 457, at 463, it stated:

"This court held in a recent case (DePauw supra) that these sections of this statute do not give any new right of action which did not exist at common law for the recovery of damages by reason of property within the city being suffered to burn for lack of adequate fire protection." (Our note in parenthesis.)

On similar facts the Supreme Court of Wisconsin held likewise in Krom, et al v. Antigo Gas Co. et al, 154 Wisc. 528 (1913). Wisconsin also has a statute almost identical to §614-68 **GC.** It reads:

"Wisconsin Public Utilities Law, Sec. 1797m—93"

"* * * If any public utility shall do or cause to be done or permit to be done any matter, act, or thing in sections 1797m-1 to 1797m—109, inclusive, prohibited or declared to be unlawful, or shall omit to do any act, matter or thing required to be done by it, such public utility shall be liable to the person, firm or corporation injured thereby in treble the amount of damages sustained in consequence of such violation; provided, that any recovery as in this section provided, shall in no manner affect a recovery by the state of the penalty prescribed for such violation."

After reargument on this very point in the Krom case, the court, at page 543, held:

"Now if the word 'injured' is used in its accurate legal sense in sec. 1797m—93, then no new liability is created by that section (except the liability for treble damages instead of single damages), unless in some other section of the law there be some provision giving to private property owners a right which they did not possess at common law under the principles of the Britton Case. Substituting in place of the word 'injured' its technical and accurate legal meaning, the section would provide that any public utility which shall fail to furnish reasonably adequate service shall be liable to the person who suffers an actionable wrong thereby in treble damages. **So read, the section does not attempt to enlarge the list of actionable wrongs, and unless some other section of the law enlarges that list so as to include such a case as the present, it seems impossible to say that the list is enlarged at all.** It was said in the former opinion that sec. 1797m—3, which provides that every public utility shall furnish reasonably adequate service and facilities, is simply declaratory of the common law and adds nothing to the obligations of public utilities, and we are still of that opinion. We have found no other section which enlarges the list of actionable wrongs so as to include the supposed wrong in the present case." (Emphasis ours.)

Pennsylvania has an almost identical statute, being Sec. 1310 of the Public Utility Law of 1937 and reading as follows:

"If any person or corporation shall do or cause to be done any act, matter, or thing prohibited or declared to be unlawful by this act, or shall refuse, neglect, or omit to do any act, matter, or thing enjoined or required to be done by this act, such person or corporation shall be liable to the person or corporation injured thereby in the full amount of damages sustained in consequence thereof: Provided, That the liability of public utilities, contract carriers by motor vehicles, and brokers for negligence, as heretofore established by statute or by common law, shall not be held or construed to be altered or repealed by any of the provisions of this act: And provided further, That the recovery in this section authorized shall in no manner affect a recovery by the Commonwealth of the penalty prescribed in section one thousand three hundred one of this act for such violations of this act."

Another case which seems to be squarely in point has been decided in Ohio. It is **A-One Automatic Heating Inc. v. East Ohio Gas Co.**, No. 591,394 in the Court of Common Pleas of Cuyahoga County. A demurrer to the petition was sustained on January 15, 1949 and plaintiff deciding not to plead further, the action was dismissed. The case was then appealed

to the Court of Appeals of Cuyahoga County, being there No. 21401. On November 7, 1949 that court affirmed the judgment in favor of East Ohio below. The plaintiff alleged that it was "engaged in the business of selling furnace and furnace parts" and for its first cause of action, that defendant had failed to carry out the terms of a franchise agreement with the City of Lakewood by refusing to supply gas to space heating consumers as a result of certain restrictive rules approved by the Public Utilities Commission of Ohio, thereby tortiously injuring the customers of plaintiff. Plaintiff for its second cause of action, made substantially the same allegations as in its first except that it alleged the terms of said franchise agreement were for its benefit and it thereby asserted damages on the contract. The courts found that neither stated a cause of action. No opinions were reported in that case but the petition and holdings are of record in the Common Pleas Court of Cuyahoga County, No. 591394, and in the Court of Appeals of that County being No. 21401, November 7, 1949.

The considered opinions and conclusions of law heretofore cited are ample authority for sustaining the demurrer.

It is held herein that:

1. The petition does not state a cause of action.

2. A seller and installer of gas space heating equipment to consumers of natural gas, cannot assert damages or injury, where the injury resulted from the violation of emergency orders of the Public Utilities Commission of Ohio, which orders were promulgated for the benefit of gas utilities and the consumer public.

3. Such purveyor of gas space heating equipment is not injured for wrongs done its prospective customers by a natural gas utility in failing to obey emergency restriction orders of the Commission and thereby being unable to serve such prospective consumers.

This ruling being dispositive of the demurrer, it is not necessary to pass upon the other points presented.